### BLALACK v. TEXAS TRACTION CO.

(Court of Civil Appeals of Texas. Dallas. June 22, 1912. Rehearing Denied Oct. 12, 1912.)

1. MASTER AND SERVANT (§ 88*)—INJURIES TO THIRD PERSONS—PERSON EMPLOYED BY OR ASSISTING SERVANT.

Where the agent of a traction company at its substation promised plaintiff that he would pay him if he helped clean the electrical machinery, and plaintiff looked to the agent for his pay, neither contemplating that he should become an employé of the company, the company was not liable to him for injuries from the machinery.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 144–152; Dec. Dig. § 88.*]

2. MASTER AND SERVANT (§ 217*)—LIABILITY FOR INJURIES TO THIRD PERSON—ASSUMED RISK.

Where plaintiff, employed by or engaged in assisting a traction company's agent in cleaning electrical machinery, knew of the danger therefrom when the current was on, he assumed the risk of injury, and the company was not liable therefor.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 574–600; Dec. Dig. § 217.*]

Appeal from District Court, Collin County; J. M. Pearson, Judge.

Action by Albert Blalack against the Texas Traction Company. Judgment for defendant, and plaintiff appeals. Affirmed.

Evans & Carpenter, of Greenville, and L. C. Clifton and Garnett & Hughston, all of McKinney, for appellant. M. B. Templeton and T. B. Williams, of Dallas, and J. R. Gough, of McKinney, for appellee.

RAINEY, C. J. Blalack brought this suit against the Traction Company to recover damages for personal injuries received by him from coming in contact with an electric wire in appellee's substation in the town of Plano, and used by appellee in operating its interurban railroad trains. The Traction Company answered by general and special exceptions, general denial, contributory negli-

gence, etc. The aid of a jury was invoked, but, upon hearing of the evidence, the court gave a peremptory instruction to the jury to return a verdict for the Traction Company, which was accordingly done, judgment so entered, and Blalack appeals.

The allegations of plaintiff's petition are: "That on the morning of October 8, 1908, C. T. Reed was the agent for the defendant in charge of said plant and machinery (meaning the substation at Plano), and it was a part of his duty to clean up said machinery and keep the same in repair, or cause the same to be repaired, and that he was authorized to employ assistants in the performance of his duties in keeping said machinery cleaned up and in repair; that said agent was in exclusive charge and control of said plant and machinery during the nighttime, and was authorized by the defendant to admit or exclude persons from that part of the station; that prior to said date it was usual and customary for the said agent to invite persons in the said building and to employ and invite persons to assist him in and about said machinery, and it was usual and customary for said agent to invite and employ the plaintiff to assist him in cleaning up said machinery, all of which custom and usage as aforesaid was well known to the defendant, or could have been known by the exercise of ordinary care; that, if said agent was not in fact authorized to employ assistants, then plaintiff alleges and charges the fact to be that the defendant was holding him up to the public and caused the public to believe that said agent possessed such authority, and the plaintiff was thereby led to believe that the said agent had authority to employ him." In said petition the plaintiff alleged, in substance, the employment by the night agent of the appellant, and that appellant was inexperienced and knew nothing of the dangers attending said work, and that the defendant's said agent directed plaintiff to go into a dangerous place and clean some insulators without giving him any notice or warning of the danger, and that appellant while in the performance of his duty as a servant, or as one invited on the premises, was seriously and permanently injured on account of coming into contact with wires charged with electricity. The claim is made in said petition that it was the duty of the defendant to have exercised ordinary care to have furnished plaintiff with a reasonably safe place in which to perform his duties, and then alleges facts showing the failure of the defendant to perform his duty, and the injury resulting proximately from such failure. Appellant assigns as error the peremptory instruction for defendant.

The evidence shows that the appellee is a corporation, duly chartered, and operates an interurban railroad from Dallas to Sherman, Tex., by way of Plano and McKinney, in Collin county. Plano was made one of its substations, there being only four on the line, to-wit, Payne, Van Alstyne, Plano, and Jenkins. The Traction Company employed for each substation a day operator and a night operator. C. T. Reed was night operator at Plano at the time of the injury to appellant, and had been acting in that capacity for something more than a month at that time. Reed had no authority to employ help, and was instructed not to allow any one in the machinery room. A substation is a brick structure in which is located a ticket office and waiting room in one part of the building. In another part of the building was located what is called a "high tension room," with a switchboard and six switches, where the wires are admitted to the building, and in another part is located the vault, rotary, and other machinery where the electricity is transformed from a high voltage to a low voltage, and also from an alternating to a direct current, which is used in propelling the cars. There are three wires that start out in the main power plant at McKinney, Tex., and run through and supply these substations. In the main room at Plano there is a big brick vault seven or eight feet high, twelve feet long, and four feet wide. Over that vault are strung backward and forward several times three high-tension copper wires, and they go around what is called "insulators," made of porcelain, which support the wires. The wires are about seven feet above the vault. These wires, when in use—that is to say, when the machinery is running or the cars are being operated—are charged with a voltage of electricity of about 19,000 volts. At about 1:30 a. m. the last car reaches its destination at McKinney, and then it is the duty of the substation agent at Plano to close down the machinery, pull all the six switches which cut out the electric current from the high tension wires over the vault, and it then becomes the duty of said agent to clean up the machinery, including the dusting and cleaning of the said insulators and wires over the vault.

Gould, one of appellee's witnesses, testified: C. T. Reed "had charge of this substation there at night, and directed the affairs there and controlled the machinery at night, and looked after the cleaning up of it or having it cleaned up, and he looked after everything pertaining to the operation of the machinery there at night. As a rule at night every one of these switches is pulled out, and they ought to be. It is the rule to pull them out, and they ought to perform that duty at night. The reason for that rule is for the purpose of getting things clean. We had to clean up at night because that is the only time when the machinery is closed down, and, when the machinery is running, we cannot clean it. If the dust gets too thick and it is very dirty, it is liable to cause arcing across the insulators."

C. T. Reed testified: "As night operator

I sold tickets, and done general office work, handled express and baggage. I handled that ticket office and baggage just like any other person in charge of the ticket office. I sold tickets, made out reports, and sent the reports into the company. I had something to do with operating the trains up and down the line in taking orders or clearances. That was part of my duties. I sustained really the relation to that road that the dispatcher does to the railroad company. As night operator my duties also were to take charge of the machinery, the starting and stopping of it, and doing necessary repairs that are in my power. The last train had gone north, and it became my duty to take charge of the machinery and clean it up where it was necessary, that is take the dust and dirt off the insulators and wires with a duster, and wiping with a rag where it was necessary to get the parts of the machinery clean. I felt rather inclement that evening, and Blalack was there, and I said to him: 'Ab., what are you going to do to-night. Anything?' and he said, 'No.' And I said: 'Would you help me to-night?' and he said, 'Yes.' And I said: 'I am not feeling well to-night,' and he said, "Why, certainly.' I believe that I did say that I would give him a quarter if he would help me. The reason I made arrangements with Mr. Blalack to assist me that night was because I felt unwell, and did not feel able to do the work on the high tension. Ordinarily the whole entire current goes off somewhere about 1:45, and, when it gets to be that time of night, as a general thing they are supposed to be free from electricity from one end to the other, and it was necessary for me if to perform certain duties I must take the necessary precaution to pull those switches. I know where the dangers are there. I never told this boy anything about it, and never instructed him anything about what I knew. He never worked for me except this night, and I never saw him work with any kind of electric appliance or contrivance."

Appellee was 22 years of age, and was a frequent visitor at the depot at night, where he and friends remained in the ticket office until 2 and 3 o'clock chatting with the operator. He testified: "While we were in there (ticket office, about 2 o'clock a. m.), Mr. Reed said he was feeling bad, and asked would I help him, that he had to get through before the lights went out, and he had some cleaning up to do, and he would pay me for it if I would, and I told him I would. * * * We then went in this machinery room. He said to go in there, and clean off this switchboard in this high-tension room, and I went and dusted that, and he was working on the rotary. I said, 'I am through, what else do you want?' and he said, 'You had better dust off those insulators. Climb up there and clean those off.' And I climbed up there and went to dusting those off. While I was dusting off those insulators, I was up on top of a rod on that iron framework, straddle of that iron pipe; that is, the iron pipe that runs across up there north and south on the frame. That pipe was an inch and a half or two inches in diameter that I was astraddle of, and I will say that was about eight or ten inches from the first copper wire that runs through those insulators. Those copper wires are about seven feet above the brick vault—that is, about half the distance from the floor—and I would say those copper wires are about a foot and a half apart or something like that, and they are not one above the other, but they are all on a level on a line running north and south parallel with each other. The insulators are fastened to the iron pipe that runs across and the wires are on top of the insulators fastened to the insulators and the insulators are about six inches high. * * * In dusting off those insulators, I had to hold on that iron frame and the wires and the insulators. The wires that I mean were those copper wires, the electric wires. This took place between 2 and 3 o'clock in the morning and at that time the machinery in the building was shut down. The last car went down at 12 o'clock at McKinney. * * * I climbed up there, and he told me to dust them off, and I was dusting them off, and I dusted off one or two and started to reach over to another one, and, of course, I had to hold to the wires, and when I touched the wires it burnt me, and that is all I remember until I woke up on the floor. There was a flash and when I came to I was on the floor." On cross-examination Blalack says: "I did not touch that wire accidentally, but on purpose. I did not know there was any juice on it, and I thought the plant was cut out, and I had to touch it in order to do the work and clean the insulators. I thought it was dangerous to touch the wire if the plant was not cut out because they said there was lots of volts on it. I knew it was dangerous from what I have heard; that is, if running. I was up above the vault on that top rod iron pipe and that would put my feet I judge six or seven feet above the top of the vault or something like that, and my head would be that much higher, of course. The proposition was for me to get up there and dust off those insulators, and, when I got up there, it was so much above my head that I couldn't stand on top of the vault and do it and had to climb upon this iron railing. I never lost my balance at all while I was up on that iron railing until I got burned. The way I came to be burned is I had to climb up there, and I hit the wire with my hand. I touched the wire purposely, but did not pull myself up by the wire. * * * I had my legs sort of wrapped around that iron rod, and astraddle of it, and reached over that way. I did not say that I thought those copper wires were harmless all the time, but I did say when the machinery was shut

down I thought it was harmless. I did not think it was harmless when there was current on it or there was electricity. I was not hunting any particular place up there, and I thought it was all safe, or I would not have went up there. I thought it was all safe at that time. The reason I thought it was safe I thought the current was cut off and I took no pains about anything so far as the electric current was concerned because I thought it was all dead. If I had not thought that I would not have touched that wire under any circumstances and would not have went up there even. I do not know how came that current on. The machinery was shut down, and I thought it was safe. The rotary was stopped and all the switches pulled around in the room where I was. I knew there was some way to shut it down and shut it off. I could not say that everybody knew, but I knew they shut down and started up at that place. * * * I did not discover any noise, zizzering, or anything like that in there, and, if I had, I would not have been in there. I guess anything like that would have attracted my attention. That machine down there buzzes when it runs. When I come down off of that ladder, that machine was not running. I could not say whether or not those switchboards were connected. I dusted those switchboards off, but I never bothered them and never paid any attention to them. I know when some things are open and when they are closed. * * * The thing I called switches in the little room looked like a piece of brass six inches long. I reckon it might have been longer. I don't know how they worked. I could not say. I was 22 years old on the 5th of September. I never examined to see whether the switches worked on a machine or what they worked on, and do not know whether I would know that or not. I never paid any attention to it. I judge those switches were there for a purpose. What the purpose was I didn't know. I knew that I didn't know. I knew there was danger in there somewhere and I didn't know where it was. I didn't know there was danger in there at that time, if I had I would not have gone in there. I thought it was dangerous when it was in motion, but I didn't know the particular place or wires that were dangerous, and I knew then that I did not know where the danger was. I relied on the fact that the thing was not running, and it was not running; that was my whole reliance. It was shut down, and I thought it was safe." Referring to the conversation between Reed and himself in the ticket office, Blalack says: "The first thing that led up to the conversation about working was that he said he was feeling bad. When he said that about feeling bad, it was just before they shut down, about 1 or 1:30. I do not know how long I had been there at that time, but about an hour and a half or two hours, I wouldn't be positive about how long. I went in there to work for him because he offered to pay me for it. I never thought anything about the other boys having been in there at that time. I never thought anything about those fellows being in there, but I was just working for the two bits. The night man cleaned up the machinery in the machinery room, and I never did see the day man do that because it was running in the daytime. I understand that they did not clean that machinery while it was running. I never saw them clean it while it was running, and I judge it would be dangerous to clean it while it was running. I did not pull those switches in that little room. I did not touch the switches only to dust them and never pulled them. I said I did not pull the switches, and I know I didn't pull what I call the switches. I don't know what all I touched, but I dusted off all of those things. I did not change anything at all in there only to take off the dust. I never pushed any switches in. I do not know how they get those highest switches on or off. I would not say whether you could reach them with your hand or not. If I am not mistaken, I dusted them off from the ladder. There are panels along there and different wires and things that wires from one to another, and I believe the ladder was up against the wall. I don't think the talk with Mr. Reed took place in the machinery room, but I think it was in the office. I knew then that I did not know how to do it. Anybody knows how to use a duster, but I did not know what to dust off. Of course, I knew how to use a duster. I did not use any rag that night. I had helped him in there before, but I wouldn't say how long before. Mr. Reed was the man that I helped. I helped Mr. Reed before that, had helped him clean up in there. I had not helped him just like I helped him that night. I had never been in that place before; that is, up to those wires where I got burned. I had helped him before that work on the rotary and rub it off with a rag and it was dead at the time. I think those wires up there would be just as harmless if they were dead. I would not say what length of time it was before I got hurt that I helped Mr. Reed this other time. The reason I was helping him was because he asked me to. I do not know what time it was, but it was after they had shut down." On further examination appellant, Blalack, stated that, before getting up over the vault where he was hurt, he had been into the high-tension room with his duster, dusting off the switches in there, and used a stepladder, and would climb up on the stepladder and dust the switches higher up, and then get down and push the ladder along, and get up and dust some more. He further says: "I dusted as high as I could reach, but never dusted clear up to the top of the house. The ladder was a tolerably tall stepladder, and I was on the

stepladder that was in there. All that I told Mr. Farmer before he asked the question as to whether or not I could have made the connection with the duster was I told him I hit it with the duster."

[1] We are of the opinion that the trial court committed no error in directing a verdict for the Traction Company. The evidence shows conclusively that Reed was not authorized to employ Blalack as a servant of the company. If it can be said he was acting in the apparent scope of his authority, we think when the whole evidence is considered the conclusion is evident that it was not in contemplation at the time of either Reed or Blalack that Blalack was to become an employé of the company, and the company be bound to him for his wages, but it shows that Blalack was merely helping Reed with work and looking alone to receive his 25 cents from Reed, and not looking for his compensation from the company. Under such circumstances, the appellee was under no obligation to furnish appellant a safe place to work or to look after his interest in any way.

But it is claimed that Reed had authority to invite persons into the machinery room, which was a dangerous place, and therefore the appellee is liable for the injury. The evidence shows that Reed not only did not have authority to invite persons into said room, but was instructed not to do so, and it was uncontradicted that the officers of the company never knew of his having done so.

[2] But, if it be conceded that such authority could have been implied, it should not avail Blalack, for his own testimony shows that he knew of the danger when the current was on, and therefore he assumed the risk of being injured.

While the occurrence is to be regretted, we have reached the conclusion the appellee is not liable therefor, and the judgment is affirmed.